UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IRMA OLIVERA,

Plaintiff,

-v-

COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

18-CV-5232 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Irma Olivera brings this action pursuant to sections 205(g) and 1631(c)(3) of the

Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), challenging the final decision of the

Commissioner denying her application for supplemental security income ("SSI"). (Dkt. No. 1.)

The parties have filed cross-motions for judgment on the pleadings. (Dkt. Nos. 13, 15.) Because

the Court concludes the Commissioner's decision was not supported by substantial evidence,

Olivera's motion is granted and the Commissioner's motion is denied. The Court remands the

case to the Social Security Administration for further proceedings.

I.      Background

On September 14, 2014, Plaintiff Irma Olivera filed an application for SSI. (Dkt. No. 12

("A.R.") at 62.) Olivera alleged that she stopped working in 2010 as a result of disability from

several medical conditions.[1]

---

[1] Though Olivera alleges she stopped working in 2010, this appeal relates only to the
period after September 14, 2014, the date on which she filed her SSI application. (A.R. 33–34.)

## A.    Medical and Treatment History

In applying for SSI, Olivera listed six medical conditions that limited her ability to work: human immunodeficiency virus (HIV), degenerative disc disease, kidney stones, carpal tunnel syndrome (CTS), asthma, and depression.  (A.R. 187.)  The Court recounts an abbreviated summary of the record evidence of Olivera's medical and treatment history for these conditions.

On September 8, 2014, Dr. Anupama Menon, an infectious disease specialist at Bronx-Lebanon Hospital, submitted a "Multiple Impairment Questionnaire."  (A.R. 263–70.)  Dr. Menon averred that she had been treating Olivera since November 15, 2012, with monthly visits for "pain management."  (A.R. 264.)  The Questionnaire stated that a 2006 magnetic resonance imaging (MRI) showed a large paracentral disc protrusion, from which Dr. Menon concluded that Olivera suffers from severe degenerative disc disease, and "which causes [Olivera] "significant pain."  (A.R. 263.)  Dr. Menon noted that, if the degenerative disc disease progressed, Olivera would suffer from "increasing pain."  (*Id.*)  She opined that, in an eight-hour workday, Plaintiff could sit for two to three hours and stand or walk for two hours (A.R. 266), and that she could "frequently" lift and carry up to five pounds (A.R. 267).  Dr. Menon stated that she did not know whether Olivera could lift or carry more than five pounds.  (*Id.*)  Olivera, Dr. Menon stated, was likely to suffer both "good days" and "bad days" as a result of her impairments and would likely miss approximately two to three days of work a month.  (A.R. 269.)

The record contains reports of several follow-up visits with Dr. Menon for pain management and HIV care, including another visit in September 2014 and visits in October 2014, November 2014, July 2016, September 2016, and December 2016.  At the September 2014 follow-up appointment, Dr. Menon prescribed Olivera oxycodone for pain management, and the

doctor renewed the prescription at two subsequent visits (A.R. 277, 289). But by July 2016, Dr. Menon had informed Olivera that she would discontinue prescribing her oxycodone. (*See* A.R. 398). At each appointment, Dr. Menon confirmed that Olivera's HIV was stable, with an undetectable viral load, and her back pain was controlled. (*See* A.R. 276–78, 279–80, 287–89, 396–98, 403–05, 425–27.) On March 24, 2017, Dr. Menon completed a second statement regarding Olivera's conditions. (A.R. 457–63.) She reported, *inter alia*, that Olivera used a cane to walk and stand (A.R. 462) and reiterated her earlier conclusion that Olivera was likely to miss work approximately twice a month as a result of her impairments or treatment. (A.R. 463.)

Olivera was also treated by several other physicians during the period at issue for various health concerns. On August 11, 2015, Olivera saw a psychiatrist at Bronx-Lebanon Hospital for complaints of anxiety and depression. (A.R. 366–68.) The treating physician noted that Olivera was last seen for anxiety and depression in April 2014 and had returned after the recent death of her sister. (A.R. 366.) The doctor diagnosed adjustment disorder and prescribed Citalopram, Trazadone, and Temazepam. (*Id.*). On March 8, 2016, and April 7, 2016, Olivera had check-ins with a nurse practitioner who reported that she showed no signs or symptoms of depression, mania, insomnia, or anxiety. (A.R. 375–78.) And on October 21, 2016, Olivera saw a different doctor for her depression. (A.R. 409.) The physician found her to be anxious and depressed and prescribed Celexa. (A.R. 410.) On November 10, 2016, at a follow-up visit, Olivera reported that she was happy with the medication changes and that her mood had returned to neutral. (A.R. 412–13.)

Olivera was also treated for CTS during the period at issue. On October 28, 2015, she was seen by an orthopedist at Bronx-Lebanon Hospital for bilateral CTS. (A.R. 369.) Olivera reported that she had undergone CTS release surgery on her right hand three years prior. (*Id.*)

The orthopedist found that Olivera had full grip strength and a full range of motion in her right hand but was suffering from some CTS symptoms in her left hand.  (*Id.*)

On May 20, 2016, Olivera was treated in the emergency room of Bronx-Lebanon Hospital for symptoms that were determined to be caused by kidney stones (A.R. 379), which she had removed by surgery one month later.  (A.R. 395.)  On February 15, 2017, she had a follow-up for her kidney condition at Bronx-Lebanon Hospital.  (A.R. 417.)  Testing showed no kidney stones.  (*Id.*)

Finally, Olivera was consultatively examined by two physicians at the Commissioner's request in connection with her application.  On January 3, 2015, Dr. Sharon Revan examined Olivera and reported, *inter alia*, that she: had a normal gait and stance; could walk on her heels and toes; used no assistive device; could squat half-way; had a reduced range of motion of the lumbar spine, with positive leg raising; had a normal range of motion in her cervical spine and extremities; and had intact hand and finger dexterity.  (A.R. 326–28.)  Dr. Revan opined that Olivera had "mild limitation[s] with sitting, standing, walking, and lying down due to her back pain . . . [and] mild to moderate limitations with personal grooming and activities of daily living secondary to back pain and hand pains."  (A.R. 328.)  On the same day, Dr. Lucy Kim examined Olivera and reported that the "results of the examination appear to be consistent with psychiatric problems," but the "unspecified mood disorder" did "not appear significant enough to interfere with the claimant's ability to function on a daily basis."  (A.R. 331.)

Olivera was 49 years old at the time of the ALJ's decision in this matter (*see* A.R. 18), had completed school through the seventh grade (A.R. 37, 188), and had previously worked as a childcare provider (A.R. 34, 179, 188).

## B.    Administrative Proceedings

Olivera was granted a hearing before Administrative Law Judge (ALJ) Lisa Hibner, which took place on March 17, 2017.  (A.R. 27–50.)  Olivera testified at the hearing as to her health, work history, and habits.

Olivera attested that she had HIV, but her viral load had been stable on medication, that the Complera she was taking for her HIV caused her to have nausea and diarrhea, and that she took Celexa for depression and anxiety.  (A.R. 43–44.)  Olivera further testified that she suffered from back pain but was not currently prescribed anything to manage the pain.  (A.R. 45).  Dr. Menon had prescribed her a walker, Olivera said, but she used a cane when the walker was inconvenient.  (A.R. 38, 46.)  She asserted that she also wore braces at night for her hands as a treatment for her CTS.  (A.R. 38.)  In terms of her functional abilities, Plaintiff reported that she could sit for one hour at a time before experiencing pain (A.R. 46), walk three or four blocks (A.R. 39), and climb two flights of stairs (A.R. 40).  She testified that she could not lift five pounds and struggled to bend down to tie her shoes.  (A.R. 40).  Olivera reported that she cooked sometimes, but did not do any other household chores, and that she generally could not do housework because of her conditions.  (A.R. 41.)  According to Olivera, combing her hair was sometimes difficult and occasionally required assistance, but she otherwise could shower and groom herself.  (A.R. 40–41.)

Following the hearing and on the request of Plaintiff's counsel, the ALJ submitted a set of interrogatories to Peter Manzi, a vocational expert ("VE").  (A.R. 229–242.)  The ALJ asked Manzi whether there were jobs that exist in the national economy that could be performed by an individual of Olivera's age, educational background, and work history, who had the residual functional capacity:

- "[T]o perform less than the full range of sedentary work[,] except lifting 10lbs occasionally and . . . [l]ess than 10 lbs frequently; carrying 10 lbs occasionally and . . . [l]ess than 10 lbs frequently; sitting for 6 hrs, standing for 2 hrs, walking for 2 hrs; push/pull as much as can lift/carry."  (A.R. 232.)

- To "climb ramps and stairs occasionally, climb ladders, ropes, or scaffolds occasionally, balance frequently, stoop occasionally, kneel frequently, crouch frequently, crawl frequently."  (*Id.*).

- And to "[u]nderstand, [r]emember & carry[]out [i]nstructions: [l]imited to perform simple, routine tasks . . . [and] simple work related-decisions."  (*Id.*)

The interrogatory posed two additional hypotheticals.  The first additional hypothetical added to the above the limitation that the worker only have "occasional exposure to dust, odors[, and] pulmonary irritants" (A.R. 232), and the second additional hypothetical added the exposure limitation and the requirement for the "use of an assistive device to ambulate and [a] sit/stand option" to "alternate positions every hour while staying on task."  (A.R. 233.)

In a response dated April 11, 2017, the VE opined that there were several unskilled sedentary jobs that the individual in the first and second hypothetical could perform, namely: (1) Table Worker, Dictionary of Occupational Titles (DOT) 739.687-182, with 12,225 jobs existing in the national economy; (2) Lens Inserter, DOT 713.687-026, with 25,000 jobs existing in the national economy; and (3) Final Assembler, DOT 713.687-018, with 12,011 jobs existing in the national economy.  (A.R. 241.)  He opined that the individual described in the third hypothetical could perform the work of a Table Worker or Lens Inserter or that of an Order Clerk, DOT 209.567-014, with 18,468 jobs existing in the national economy.  (*Id.*)

On April 28, 2017, Plaintiff's counsel submitted to the ALJ a letter proposing an additional limitation to the VE: that the "hypothetical person would miss at least two (2) days of work a month on an unscheduled basis." (A.R. 254.) The remaining limitations were to remain the same. (*See id.*) On May 4, 2017, the ALJ forwarded the proposed additional limitation to VE Manzi, and on May 22, 2017, Manzi replied that "for all three hypotheses, no work would be possible when missing at least two days of work a month on an unscheduled basis." (A.R. 258.)

On September 25, 2017, ALJ Hibner issued her decision in this matter, finding that Olivera was not disabled within the meaning of the Social Security Act and denying Olivera's application for benefits. The ALJ followed the Social Security Administration's five-step process for assessing whether an individual is disabled under the Social Security Act. (A.R. 13–19.) At the first step, the ALJ determined that Olivera has not been engaged in substantial gainful activity since the date of her application for SSI. (A.R. 13.) The ALJ proceeded to find at the second step that Olivera has several medical impairments that "significantly limit [her] ability to perform basic work activities" and therefore qualify as "severe": namely, degenerative disc disease, CTS, HIV, and depression. (A.R. 13.) She also determined that Olivera's kidney stones, asthma, and anxiety are not severe. (*Id.*) At the third step, the ALJ found that Olivera's impairments, singly or in combination, are not *per se* disabling because they are not of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (A.R. 13–15.) The ALJ then turned to consideration of Olivera's RFC. (A.R. 15.) The ALJ found that Olivera retains "the residual functional capacity to perform sedentary work as defined in 20 CFR [§] 416.967(a) except [she] can occasionally climb ramps and stairs, ladders, ropes, and scaffolds. [Olivera] can frequently balance, occasionally stoop, frequently kneel, frequently crouch, and frequently crawl. [She] requires an assistive device to ambulate

and a sit/stand option that allows her to alternate positions every hour while staying on task." (A.R. 15.)  Finally, the ALJ concluded, Olivera is "limited to simple, routine tasks, and simple work-related decisions."  (*Id.*)  Proceeding to step four, the ALJ determined that Olivera is unable to perform any past relevant work.  In reaching that conclusion, the ALJ relied in part on the VE's testimony that, given the limitations proposed by the ALJ, Olivera would be unable to perform past relevant work.  (A.R. 18.)  The ALJ specifically noted, however, that she rejected counsel's proposed limitation to the VE that the claimant would miss two days of work per month on an unscheduled basis, reasoning that "the evidence as a whole does not support this degree of limitation" because "[n]o treating or evaluating source provided a medical source statement suggesting unscheduled absences."  (*Id.*)  Finally, at step five, the ALJ relied on the same testimony by the VE and found that, considering Olivera's "age, education, work experience, and residual functional capacity," there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (A.R. 18–19.)  She therefore concluded that Olivera is not disabled within the meaning of the Social Security Act.  (A.R. 19.)

The ALJ's decision became the final decision of the Commissioner on April 9, 2018, when the Appeals Council denied Olivera's request for review.  (A.R. 1–4.)  Olivera filed this suit challenging the decision of the Commissioner on June 11, 2018, pursuant to § 205(g) and § 1631(c)(4) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3).  (*See* Dkt. No. 1.)

## II.    Legal Standards

### A.    Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)).  "Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A court may not substitute its judgment for the Commissioner's "even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)). This is because "substantial evidence" is "a very deferential standard of review — even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). Under this "very deferential" substantial-evidence standard, this Court may reject the ALJ's view of the facts "only if a reasonable factfinder would have to conclude otherwise." *Id.* (emphasis omitted) (second quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**B.      Legal Framework for Disability Claims**

To establish disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration employs a five-step procedure to analyze disability claims. The Commissioner considers whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a "severe impairment" as defined in Social Security Administration's regulations; (3) the claimant has an impairment listed in Appendix I of the regulations; (4) the claimant has a residual functional capacity (RFC) to perform her past

work; and (5) there is other work the claimant could perform. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (Sotomayor, J.); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof at the first four steps; the Commissioner bears the burden at the final step. *Rosa*, 168 F.3d at 77. But "[t]he Commissioner's burden at step five is" only "to show the existence of possible employment for an individual with the RFC *determined by the ALJ* in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018). In conducting its analysis, the ALJ has an affirmative duty to "develop the record." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

## III.    Discussion

Olivera does not contest the ALJ's findings with respect to steps one through three of the five-step procedure. Instead, she challenges only the ALJ's findings at step four regarding her RFC and, consequently, the determination at step five that there exists other work in the national economy that Olivera could perform. (*See* Dkt. No. 14 at 10–14.) Olivera presents three arguments in support of her challenge. Each relates to Olivera's RFC and the hypothetical the ALJ posed to the VE. Specifically, she argues that the ALJ erred: (1) by rejecting the proposed limitation that Olivera would miss at least two days of work a month on an unscheduled basis; (2) by including in the hypothetical to the VE certain physical capabilities which were not supported by substantial evidence; and (3) by declining to incorporate additional limitations into the hypotheticals posed to the VE based on alleged side effects of Olivera's medications. (*Id.*)

The Court agrees with Olivera that the ALJ's rejection of Plaintiff's proposed limitation warrants remand. "While the ALJ's decision need not mention every item of testimony presented or reconcile explicitly every conflicting shred of medical testimony, the ALJ may not ignore or mischaracterize evidence of a person's alleged disability." *McDonagh v. Acting*

*Comm'r of Soc. Sec.*, No. 16 Civ. 8698, 2017 WL 9286987, at *8 (S.D.N.Y. Nov. 27, 2017) (citations, alterations, and internal quotation marks omitted), *report and recommendation adopted*, No. 16 Civ. 8698, 2018 WL 2089340 (S.D.N.Y. May 2, 2018). Thus, ordinarily, "[w]hen the record contains testimony tending to contradict the ALJ's conclusion, the ALJ must acknowledge the contradiction and explain why the conflicting testimony is being disregarded." *Arias v. Astrue*, No. 11 Civ. 1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012).

Here, the ALJ reasoned that the "evidence as a whole does not support" the conclusion that Olivera would miss two days of work per month because "[n]o treating or evaluating source provided a medical source statement suggesting unscheduled absences." (A.R. 18.) But, as Olivera rightly notes, Dr. Menon specifically opined that Olivera's "impairments [were] likely to produce 'good days' and 'bad days'" and that as a consequence of her impairments or treatments, Olivera would likely be absent from work "[a]bout two to three times a month." (A.R. 269.) Indeed, Dr. Menon stated this opinion not only once but twice, several years apart. (A.R. 269, 463.) The ALJ did not justify or acknowledge this omission; to the contrary, the ALJ expressly declined to afford weight to only one portion of Dr. Menon's report (her "opinion as to the claimant's mental limitations," (A.R. 18)) and said nothing to suggest she would not credit the remaining portions.

The Commissioner responds that notwithstanding Dr. Menon's opinion that Olivera would miss at least two days a month of work, the ALJ could have rejected the limitation because that portion of Dr. Menon's report allegedly conflicted with other portions of the record. (Dkt. No. 16 at 21.) But the mere possibility that the ALJ could ultimately reach the same conclusion, following an altogether novel line of reasoning, does not render the ALJ's error harmless. The VE opined that there would be no jobs that exist in substantial numbers in the

national economy for a person with the limitations proposed in the hypotheticals if the contested two-day absence limitation were included. (A.R. 258.) Had the ALJ credited the overlooked statements by Dr. Menon and the testimony of the VE, Olivera would have qualified as disabled. That alone warrants remand.

Olivera also argues that reliance on the VE's response to interrogatories was improper because the hypotheticals overstated her postural capabilities. (*See* Dkt. No. 14 at 13.) Specifically, Olivera argues that the ALJ erred in asking the VE to consider a hypothetical person who could "occasionally climb ramps, stairs, ladders, ropes, scaffolds and stoop, and could also frequently[] balance, kneel, crouch, and crawl" because the administrative record did not furnish substantial evidence for those capabilities. (Dkt. No. 14 at 13; *see also* A.R. 232.) The Court declines to reach this issue because Olivera's first objection supplies an independent and sufficient basis for remand. However, because the argument raises a substantial issue, the Court briefly addresses it, in order to aid the agency on remand.

"The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the VE's testimony." *Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 449 (S.D.N.Y. 2004). If an ALJ's hypothetical omits a claimant's capabilities and impairments, the VE's testimony cannot constitute substantial evidence for the ALJ's ultimate decision. *See id.*

No medical opinion in the record directly substantiates that Olivera has the postural capabilities to climb ladders, ropes, and scaffolds, to stoop, and to kneel, crouch, or crawl. (*See* Dkt. No. 16 at 12–13.) The Commissioner nonetheless argues that the "record as a whole" provides such support. But in service of that proposition, the Commissioner cites several inapposite portions of the record. For example, the Commissioner emphasizes Dr. Revan's

opinion that Olivera had "no limitations in fine and gross motor activity, and only mild limitations in sitting, standing, walking, and lying down." (Dkt. No. 16 at 13 (citing A.R. 328).) Yet this citation materially mischaracterizes Dr. Revan's testimony; her report indicates that Olivera had "no limitations *with the upper extremities* for fine and gross motor activity." (A.R. 328 (emphasis added).) Moreover, the ALJ found that Dr. Revan's report *understated* Olivera's limitations, because "the claimant's pain complaints, considered together with the objective medical evidence suggest greater limitations in standing and walking." (*See* A.R. 17.)

The Commissioner also veers astray in devoting several pages of briefing to arguing that Olivera's own testimony supported the finding that she could do sedentary work. (*See* Dkt. No. 16 at 15–17.) Even if the Commissioner is correct, these arguments still miss the mark. The determination that a claimant can perform sedentary — as opposed to light, medium, heavy, or very heavy — work relates to the claimant's *exertional* limitations, i.e., those limitations based on the "strength . . . for sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 416.969a(a). By contrast, Olivera's challenge relates to postural, non-exertional limitations, like stooping, climbing, crawling, crouching, balancing, and kneeling. *See id.* § 416.969a(c)(1)(vi); Titles II & XVI: Determining Capability to Do Other Work — Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, SSR 96-9p, 1996 WL 374185 (July 2, 1996). That Olivera may be capable of sedentary work is therefore entirely consistent with her having other postural, non-exertional limitations.

Moreover, the ALJ credited Dr. Menon's opinion that Olivera required an assistive device to ambulate (A.R. 18) and noted the existence of medical evidence suggesting "reduced range of motion in the lumbar spine, positive straight leg raises bilaterally, and tenderness to palpation in the lumbar spine," (A.R. 16). This testimony fairly raises some doubt as to

Olivera's ability to, say, crawl or kneel.  And the lack of a specific explanation in the ALJ's decision for the findings related to postural limitations to some extent frustrates this Court's review.  Thus, clarification of the basis of those determinations may be productive on remand. Nonetheless, because the omission regarding unplanned absences from work is sufficient to warrant remand, the Court need not reach the question whether this too necessitates remand.

**IV.    Conclusion**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion for judgment on the pleadings is DENIED. Pursuant to 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further proceedings consistent with this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 13 and 15 and to close this case.

SO ORDERED.

Dated:  September 30, 2019
        New York, New York

_____
          J. PAUL OETKEN
      United States District Judge